IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 08-00321-03-CR-W-GAF |
| | ) |
| DEONDRE CORDELL HIGGINS, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Before the court is Defendant's Motion to Suppress on grounds that officers did not have reasonable suspicion to conduct a traffic stop.[1] Defendant, therefore, moves the Court to suppress all evidence recovered from the vehicle. Defendant also requests that the Court suppress his subsequent statements as fruit of the poisonous tree.

*I. BACKGROUND*

The week prior to January 6, 2008, Kansas City, Missouri Police Officers Rebecca Mills and Daniel Parker conducted a pedestrian check near the area of 40 Highway. The woman told the officers she had been staying in room 120 at the Welcome Inn, and that unidentified parties in the room were dealing crack cocaine. On January 6, 2008, Officers Mills and Parker drove past room 120 at the Welcome Inn. When the vehicle parked in front of room 120 left the motel, Officers Mills

---

[1] In the motion to suppress, Defendant also challenges Count II of the Indictment on grounds that laboratory testing revealed the substance to be "cocaine (form indeterminate)" rather than crack cocaine as charged (Doc. No. 56, p. 10; Tr. at 6-10). This Report and Recommendation will not address this issue, as I find it to be a relevancy issue for trial (Tr. at 10).

1

and Parker followed and subsequently performed a traffic stop. A search of the vehicle revealed cocaine (form indeterminate).

Defense counsel filed the instant motion to suppress on April 16, 2009 (Doc. No. 56). The government responded to Defendant's motion on June 4, 2009 (Doc. No. 72). On June 30, 2009, I conducted an evidentiary hearing. The government appeared by Assistant United States Attorney Bruce Rhoades. Defendant was present, represented by appointed counsel Alex McCauley. The parties stipulated to the factual portions of their respective pleadings as the testimony of the officers that were involved in the underlying events (Tr. at 3-5). The government called Kansas City, Missouri Police Officer Rebecca Mills[2] and Kansas City, Missouri Police Officer Daniel Parker to testify. In addition, the following exhibits were marked and admitted into evidence:

Government's Exhibit 1: Police Videotape
Defendant's Exhibit 1: Incident Report

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. The week prior to January 6, 2008, Kansas City, Missouri Police Officers Rebecca Mills and Daniel Parker had contact with an unknown prostitute near the area of 40 Highway while conducting a pedestrian check (Doc. Nos. 56, 72; Tr. at 22, 36; Def. Exh. 1). This was the officers first encounter with the prostitute (Tr. at 46).

---

[2]As of the date of the suppression hearing, Rebecca Mills was a detective with the Kansas City, Missouri Police Department (Tr. at 16). Because Detective Mills had not yet become a detective on the date of the traffic stop that is the subject of Defendant's motion to suppress, she will be referred to as "Officer Mills" throughout this Report and Recommendation.

2

2. The officers did not know if the prostitute was a documented informant (Tr. at 24, 48). At the suppression hearing, Officer Mills testified she knew the prostitute's race, gender and last name (Tr. at 23-24). She did not know the woman's first name or whether she had provided reliable information in the past (Tr. at 23-24). Officer Parker similarly testified he did not know her first and last name or identifiers, but that such information would be contained in their activity log (Tr. at 46-47).

3. The prostitute told Officers Mills and Parker she had been staying in room 120 at the Welcome Inn at 7901 E. 40 Highway in Kansas City, Missouri, and that unidentified parties in the room were dealing crack cocaine (Doc. Nos. 56, 72; Def. Exh. 1).

4. At the time Officers Mills and Parker encountered the prostitute, she was breaking the law (Tr. at 46). The prostitute was not arrested for her illegal activities and was, instead, let go in exchange for providing the officers information (Tr. at 23, 36, 47-48).

5. Following receipt of this information, neither Officers Mills nor Parker sought to ascertain who was staying in room 120 (Tr. at 24, 29). They did not contact management at the Welcome Inn to inquire what cars were associated with room 120 (Tr. at 25, 29). Likewise, they did not personally identify vehicles parked in front of or people going into room 120 (Tr. at 25).

6. Approximately one week later, on January 6, 2008, Officers Mills and Parker went to the Welcome Inn and did a drive by of room 120 based on the information given to them by the prostitute (Doc. Nos. 56, 72; Def. Exh. 1). Officers Mills and Parker were in uniform and operating a marked, two-person unit (Tr. at 22, 38).

7. The Welcome Inn is a high-traffic motel; it is common for people to come and go (Tr. at 25, 49). Officer Parker testified there are also a number of long-term rentals (Tr. at 45).

8. On January 6, 2008, Officer Parker possessed information through fellow officer statements, other departmental investigations, and his own experience that the 7901 E. 40 Highway corridor was an area of interest for stolen automobiles, state warrants and drug arrests (Doc. Nos. 56, 72; Def. Exh. 1). The area was categorized as a high narcotic manufacturing and distribution location (Doc. Nos. 56, 72; Def. Exh. 1). Officer Mills further testified the area was known for calls for service, disturbances, stolen automobiles, narcotics and prostitution (Tr. at 28).

9. The officers did not have any specific information that the individuals the prostitute described were still occupying room 120 (Tr. at 26).

10. Officer Mills and Parker observed a gray Chevrolet 4-door passenger car backed into a parking spot in front of room 120 at the Welcome Inn with is parking lights on (Doc. Nos. 56, 72; Def. Exh. 1; Tr. at 26). A white female was in the driver's seat and a dark complected black male was in the front passenger seat (Doc. Nos. 56, 72; Tr. at 28). The officers also observed a black male and a white male standing outside the room 120 with the door slightly ajar (Doc. Nos. 56, 72; Def. Exh. 1). A white female was seen through the doorway sitting in front of the window with the curtains drawn (Doc. Nos. 56, 72; Def. Exh. 1).

11. Officers Mills and Parker acquired the number from the license plate of the gray Chevrolet (Doc. Nos. 56, 72; Def. Exh. 1). They turned their vehicle around at the far end of the motel

4

and performed a license plate check (Doc. Nos. 56, 72; Def. Exh. 1). The computer check revealed that the license plate belonged to the listed vehicle and was owned by a rental agency (Doc. Nos. 56, 72; Def. Exh. 1). There were no warrants associated with the license plate (Tr. at 26).

12. The officers conducted a second drive by as they were leaving the area (Doc. Nos. 56, 72; Def. Exh. 1). This time, the vehicle had a different driver (Tr. at 28, 38). A black male occupied the driver's seat and a dark complected black male sat in the front passenger's seat (Doc. Nos. 56, 72; Def. Exh. 1). A white female was observed leaving room 120 (Doc. Nos. 56, 72; Def. Exh. 1). This woman went to the vehicle, opened the left passenger door and positioned herself to enter the vehicle (Doc. Nos. 56, 72; Def. Exh. 1).

13. Officers Mills and Parker then left the parking lot area to conduct surveillance from outside the perimeter of the motel (Doc. Nos. 56, 72; Def. Exh. 1).

14. After a few minutes, the officers observed the vehicle entering onto 40 Highway traveling eastbound (Doc. Nos. 56, 72; Def. Exh. 1; Tr. at 26-27). Officer Parker pulled onto 40 Highway and observed the vehicle gaining a lot of ground (Doc. Nos. 56, 72; Def. Exh. 1).

15. Officer Mills testified that the driver did not use a turn signal as the vehicle entered 40 Highway (Tr. at 29). Officer Parker testified he did not recall the turn signal violation and stated he did not include this alleged violation in the incident report (Tr. at 37, 44-45, 49-50).

16. At another point, the vehicle activated its turn signal as if to turn south onto Stadium Drive from 40 Highway, but opted not to turn and continued eastbound on 40 Highway (Doc. Nos. 56, 72; Def. Exh. 1; Tr. at 28).

5

17. At 10:34 p.m., Officers Mills and Parker activated their lights stopped the vehicle to perform a car check (Doc. Nos. 56, 72; Def. Exh. 1; Tr. at 38). Officer Mills testified the stop was based on the information they had received from the prostitute, their observations when they saw the vehicle at the motel, for failure to signal when turning onto 40 Highway, and the area's reputation for crime (Tr. at 16-17, 28, 37-38; Def. Exh. 1).

18. The driver of the vehicle was identified as DeCarlos Lytell Walker, and the passenger in the right front was identified as Defendant (Doc. Nos. 56, 72; Def. Exh. 1; Tr. at 33). Stacie Emmerich and Michelle Carlisle were found in the rear passenger seats of the vehicle (Doc. No. 56; Def. Exh. 1; Tr. at 33).

19. Subsequent to the stop, the officers observed suspicious movement in the car by the rear passenger, Ms. Emrich (Doc. No. 56; Def. Exh. 1).

20. Officer Mills instructed Ms. Emrich to sit still and make her hands visible (Tr. at 17, 18; Def. Exh. 1). Ms. Emmerich continued to move despite several requests not to, and Officer Mills could see an object in her hand (Tr. at 17; Def. Exh. 1). Ms. Emmerich stuck her hand under or between her thigh and the back of her seat (Tr. at 17; Def. Exh. 1). The object in her hand looked like a plastic bag (Tr. at 17; Def. Exh. 1). Officer Mills believed Ms. Emmerich was either trying to conceal something or pull something out (Tr. at 17; Def. Exh. 1).

21. Officer Mills asked Officer Parker to help remove Ms. Emmerich from the vehicle (Tr. at 17, 18). She did so because Ms. Emmerich would not stop moving, for officer safety and the safety of the others in the vehicle (Tr. at 18).

22. After Ms. Emmerich was removed from the vehicle, Officer Mills discovered a metal spindle from inside a blender near Ms. Emmerich's ankle (Tr. at 19, 30, 33; Def. Exh. 1). The

spindle had a white, cakey residue on it (Tr. at 34; Def. Exh. 1). Officer Mills also located a plastic bag or tissue in Ms. Emmerich's hand (Tr. at 19).

23. Officers Mills and Parker then removed Ms. Carlisle from the vehicle (Tr. at 20; Def. Exh. 1). The officers discovered a glass pipe used for smoking crack on or around this woman (Tr. at 20, 30; Def. Exh. 1).

24. Mr. Walker and Defendant were also removed from the vehicle (Tr. at 44; Def. Exh. 1).

25. A sergeant field tested the spindle recovered from Ms. Emmerich's person; the substance on the spindle showed a positive reaction for crack cocaine (Def. Exh. 1; Tr. at 34).

26. A drug dog was then called to perform a sniff (Tr. at 20, 35, 44; Def. Exh. 1). During the sniff, the dog went inside the vehicle (Tr. at 44, 53).

27. The drug dog alerted positively to the presence of a controlled substance in the vehicle (Tr. at 20).

28. Based on the dog's alert, the officers searched the vehicle (Tr. at 21). During the search, officers recovered a substance weighing 85.7 grams from the dash behind and underneath the vehicle's stereo (Tr. at 53-54; Def. Exh. 1). This substance was later identified by the Kansas City Crime Laboratory as cocaine (form indeterminate), a schedule II controlled substance (Doc. No. 56; Def. Exh. 1).

### III. LEGAL ANALYSIS

Defendant argues that Officers Mills and Parker lacked reasonable suspicion to stop the vehicle in which he was a passenger. Under Terry v. Ohio, "[l]aw enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity." United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005). "A reasonable suspicion is a

7

'particularized and objective' basis for suspecting the person who is stopped." Id. (quoting United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001)). An "inchoate and unparticularized suspicion or 'hunch'" is not enough. Terry, 392 U.S. at 27; see also United States v. Sokolow, 490 U.S. 1, 7 (1989). In determining whether reasonable suspicion exists, the court considers "the totality of the circumstances in light of the officers' experience and specialized training." United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006).

The government contends that Officers Mills and Parker had reasonable suspicion to conduct a traffic stop based on the information from the prostitute, the fact that the Welcome Inn was in a high-crime area, and the actions of the occupants of the vehicle while parked in front of room 120. I disagree.

The government argues that the information obtained from the prostitute about the activities in room 120 of the Welcome Inn was reliable because it was gained through a face-to-face transaction. In United States v. Kent, the Eighth Circuit held that information learned from face-to-face informants was generally more reliable than that learned from anonymous tipsters. 531 F.3d 642, 649 (citing United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991)). This is so because face-to-face informants can be held accountable for false information. Id. The record from the suppression hearing does not support the government's argument. The prostitute from whom Officers Mills and Parker received information about drug activity in room 120 of the Welcome Inn was not a documented informant. The week prior to January 6, 2008, was the officers first encounter with her and they did not know if she had provided reliable information in the past. Officer Mills testified she knew only the woman's race, gender and last name; Officer Parker testified he knew neither her first and last name nor her identifiers. Without this information, the officers could not

8

have held the woman accountable for inaccurate information. Officer Parker testified he believed the prostitute's identifying information could be found in their activity log; however, the activity log and its contents were not made part of the record at the suppression hearing.

Due to the lack of identifying information about the prostitute, I find her to be more similar to an anonymous tipster. An anonymous tip can form the requisite reasonable suspicion for a traffic stop if it is corroborated and exhibits sufficient indicia of reliability. See Florida v. J.L., 529 U.S. 266, 270 (2000). "[T]he age of the tip calls into question its reliability." Wiley v. Dep't of Justice, 328 F.3d 1346, 1356 (8th Cir. 2003).

The information given to Officer Mills and Parker by the prostitute was neither corroborated through investigation or surveillance nor exhibited independent indicia of reliability. The information the woman gave the officers was very general, stating "unidentified parties" were dealing crack cocaine in room 120. Officer Mills and Parker did not seek to ascertain who was staying in room 120 at the time they received this information. They did not contact management at the Welcome Inn to determine what vehicles were associated with the room. They did not conduct surveillance to identify individuals coming to or leaving from room 120. Not until one week later did Officers Mills and Parker act on this information regarding drug activity in room 120 at the Welcome Inn. However, the Welcome Inn is a high-traffic motel. Officers Mills and Parker did not have any information on January 6, 2008, that the same individuals were occupying room 120 as were one week prior. The information provided by the prostitute thus does not support a finding of reasonable suspicion.

The government also relies on the fact that the Welcome Inn is in a high-crime area and on the behavior of the vehicle's occupants while at the motel. Mere presence in a high-crime area is

9

not enough to establish reasonable suspicion; rather, the presence in a high-crime area must be accompanied by suspicious behavior. United States v. Bailey, 417 F.3d 873, 877 (8th Cir. 2005); United States v. Gray, 213 F.3d 998 (8th Cir. 2000). Here, when Officers Mills and Parker drove by room 120 the first time on January 6, 2008, they observed a white female in the driver's seat and a dark complected male in the front passenger seat of a vehicle parked in front of the room. A black male and a white male were standing outside room 120 with the door ajar, and the officers could see a white female inside. When the officers drove past room 120 again after performing the license plate check, they observed a black male in the driver's seat, a dark complected male in the front passenger's seat, and a white female entering the vehicle. Neither officer testified this behavior was consistent with drug dealing, prostitution, or any other type of illegal activity. Indeed, I find that it is not atypical of behavior that is expected to be observed at a motel. See Gray, 213 F.3d at 1001 (quoting United States v. Eustaquio, 1998 F.3d 1068, 1071 (8th Cir. 1999))("Too many people fit this description for it to justify a reasonable suspicion of criminal activity.").

Lastly, the manner in which the vehicle was operated after leaving the Welcome Inn and while traveling on 40 Highway did not provide Officer Mills and Parker reasonable suspicion or probable cause to perform a traffic stop. There were no warrants associated with the licence plate on the vehicle. The driver of the vehicle did not commit any traffic violations. Officer Mills testified at the suppression hearing that the driver failed to use a turn sign as the vehicle entered 40 Highway; however, Officer Parker testified he did not recall a turn signal violation and such a violation was not included in the incident report. I find that Officer Mills may be confusing this traffic stop with another event and, therefore, deem Officer Parker's testimony more credible.

Because the totality of the circumstances surrounding the traffic stop fail to establish reasonable suspicion, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting Defendant's Motion to Suppress Evidence and Statements.

Government counsel and Defendant are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 20, 2009