IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )        Criminal Action No.
                                    )        08-00321-03-CR-W-GAF
                                    )
DEONDRE CORDELL HIGGINS,            )
                                    )
                Defendant.          )

## REPORT AND RECOMMENDATION TO GRANTING IN PART
### AND DENYING IN PART DEFENDANT'S MOTION
### TO SUPPRESS THIRD-PARTY STATEMENTS

Before the court is Defendant's motion to suppress third-party statements on grounds that the statements are fruits of the poisonous tree. Defendant moves the Court to suppress statements made by Stacie Emmerich, Tracie Emmerich and Michelle Carlisle, arguing that they should not be allowed to offer testimony about the evidence concerning the January 6, 2008 traffic stop. The government maintains that the testimony should be admissible pursuant to the independent source, attenuation and inevitable discovery exceptions. As more fully set forth below, while testimony about the January 6, 2008 traffic stop itself should not be permitted, testimony about conspiratorial activities preceding and subsequent to the January 6, 2008 traffic stop and also about the January 15, 28 and 29, 2008 undercover operations should be allowed. Specifically, I recommend that the information contained in: (1) Stacie Emmerich's January 16, 2008 statement (Gvt. Exh. 1) be found admissible under the independent source exception; (2) Tracie Emmerich's January 16, 2008 statement (Gvt. Exh. 4) be found admissible under the independent source exception; (3) Michelle

1

Carlisle's January 16, 2008 statement (Gvt. Exh. 5) be found admissible under the independent source exception; (4) Stacie Emmerich's January 30, 2008 statement (Gvt. Exh. 2) be found admissible under the attenuation exception (with regard to activities that took place on January 6, 2008 prior to the traffic stop) and the independent source exception (with regard to the January 28-29, 2008 narcotic transactions); (5) Michelle Carlisle's February 6, 2008 statement (Gvt. Exh. 6) be found admissible under the attenuation exception; (6) Stacie Emmerich's March 17, 2008 statement during the photo identification (Gvt. Exh. 9) be found admissible under the attenuation exception; (7) Stacie Emmerich's March 17, 2008 proffer statement (Gvt. Exh. 3) be found admissible under the attenuation exception (with regard to activities that took place on January 6, 2008 prior to the traffic stop) and the independent source exception (with regard to overall conspiratorial activities); (8) Stacie Emmerich's April 10, 2008 proffer statement (Gvt. Exh. 10) be found admissible under the independent source exception; and (9) Michelle Carlisle's July 13, 2008 statement (Gvt. Exh. 11) be found admissible under the independent source doctrine.

## I.  BACKGROUND

An indictment was returned on November 20, 2009, charging Defendant with:  one count of conspiracy to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846; one count of possession with the intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2; and two counts of distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

On September 8, 2009, the Court entered an order suppressing all evidence obtained from the January 6, 2008 traffic stop, as well as Defendant's subsequent statements as fruits of the poisonous tree (Doc. No. 92).  Defendant filed a motion in limine on June 24, 2010 moving the

Court to preclude the government from offering testimonial evidence at trial involving evidence that was illegally seized during the January 6, 2008 traffic stop (Doc. No. 129). The government responded on June 30, 2010 (Doc. No. 140). After consultation with Judge Fenner, I construed the motion as a motion to suppress.

An evidentiary hearing was held on August 5, 2010. The government appeared by Assistant United States Attorney Bruce Rhoades. Defendant was present, represented by appointed counsel Alex McCauley. During the August 5, 2010 suppression hearing, it was determined three potential witnesses were at issue: Stacie Emmerich, Tracie Emmerich and Michelle Carlisle (Tr. at 5-7).[1] The government stated it did not intend to question Stacie Emmerich, Tracie Emmerich or Michelle Carlisle at trial about the January 6, 2008 traffic stop; in fact, the government's witnesses will be instructed that they are not to discuss anything about the traffic stop (Tr. at 4-13, 17-18). The government does wish, however, to ask these witnesses about events that took place on January 6, 2008 prior to the traffic stop (Tr. at 9-11, 16-18).[2] The government called Kansas City, Missouri Police Detective Jason Decker to testify. In addition, the following exhibits were marked and admitted into evidence:

| | |
|---|---|
| Government's Exhibit 1: | Investigative Report dated 01/16/08<br>Interview of Stacie Emmerich |
| Government's Exhibit 2: | Investigative Report dated 01/30/08<br>Interview of Stacie Emmerich |
| Government's Exhibit 3: | Investigative Report dated 03/17/08<br>Proffer Statement of Stacie Emmerich (SEALED) |
| Government's Exhibit 4: | Investigative Report dated 01/16/08<br>Interview of Tracie Emmerich |

---

[1]The government stated it does not intend to call DeCarlos Walker as a witness at trial (Tr. at 6).

[2]To be sure, the government does not seek to introduce into evidence hard copies of the statements in issue. Rather, it intends to elicit testimony from Stacie Emmerich, Tracie Emmerich and Michelle Carlisle at trial about the overall conspiratorial activities (Tr. at 9).

| | |
|---|---|
| Government's Exhibit 5: | Investigative Report dated 01/16/08 |
| | Interview of Michelle Carlisle |
| Government's Exhibit 6: | Investigative Report dated 02/06/08 |
| | Interview of Michelle Carlisle |
| Government's Exhibit 7: | 10/15/07 Dragnet Report, page 9 |
| Government's Exhibit 8: | 10/15/07 Dragnet Report, page 8 |

On August 9, 2010, the government sought to supplement the record with three additional exhibits.

Defendant did not object. Accordingly, the following exhibits were admitted into the record:

| | |
|---|---|
| Government's Exhibit 9: | Investigative Report dated 03/17/08 |
| | Suspect Identification/Recovered Property |
| Government's Exhibit 10: | Investigative Report dated 04/10/08 |
| | Proffer Statement of Stacie Emmerich (SEALED) |
| Government's Exhibit 11: | Investigative Report dated 07/13/08 |
| | Interview of Michelle Carlisle |

(Doc. No. 161).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.[3]  Analysis of the two sealed exhibits (i.e., Government's Exhibit 3 and Government's Exhibit 10) is contained in a separate, sealed document filed contemporaneously with this Report and Recommendation.

1.      The Kansas City, Missouri Police Department has two units that investigate narcotics: the Drug Enforcement Unit ("DEU") and the Street Narcotics Unit ("SNU") (Tr. at 24). SNU deals with low-level street dealers; by contrast, DEU deals with upper-level field possession cases (Tr. at 25-26).

_____

[3]Shortly after the August 10, 2010 suppression hearing began, the recording system in my courtroom quit working.  I, therefore, stopped the hearing and obtained a court reporter.  Due to this malfunction, two transcripts from the suppression hearing were generated: (1) a partial transcript captured by the electronic recording system before any evidence was received (Doc. No. 159); and (2) a transcript produced by the court reporter that contains the evidence presented by the parties (Doc. No. 160).  The findings of fact set forth in this Report and Recommendation are gleaned exclusively from the latter.

2.      SNU receives investigative leads through an anonymous tips hotline (Tr. at 24, 45). When the caller gives information to an operator, a dragnet report is created and faxed to SNU (Tr. at 24). The sergeant then distributes the reports to officers to investigate the leads (Tr. at 27-28).

3.      Kansas City, Missouri Police Detective Jason Decker was a member of SNU in 2007 and 2008 (Tr. at 23-24).

4.      On October 15, 2007, the Kansas City, Missouri Police Department received two calls through the anonymous tips hotline (Tr. at 28, 44-45; Gvt. Exh. 7; Gvt. Exh. 8). The tip received at 9:53 a.m. referenced "Deandre Higgins" and "Kim Williams" (Tr. at 29; Gvt. Exh. 7). The caller provided information about a drug house located at 3512 E. Independence Avenue where crack cocaine was being sold (Gvt. Exh. 7). According to the caller, Deandre Higgins -- a black male who had just been released from prison -- and Kim Williams were involved with the drug house (Tr. at 29-30; Gvt. Exh. 7). The caller gave Mr. Higgins' inmate number and stated he may be more likely to sell to a female than a male (Tr. at 30, 53; Gvt. Exh. 7). The tip received at 1:30 p.m. also provided information about crack cocaine being sold at a drug house located at 3512 E. Independence Avenue (Gvt. Exh. 8). The caller identified "Deandre Higgins" and "Kim Williams" as persons involved (Tr. at 30; Gvt. Exh. 8). Deandre Higgins was described as a black male in a wheelchair (Tr. at 30; Gvt. Exh. 30). The caller stated Mr. Higgins had been released from prison two weeks ago and was already selling drugs (Gvt. Exh. 8). Detective Decker did not recall when the officers received these dragnet reports (Tr. at 31).

5.      On January 15, 2008, SNU conducted an undercover operation (Tr. at 32). As part of the operation, officers were looking for people in the area of 40 Highway from whom they could buy narcotics (Tr. at 32). The officers' activity was not a direct result of the October 15, 2007

dragnet reports; rather, they were merely working in an area known to be high in narcotics trafficking (Tr. at 32, 40, 45). The officers were unaware of the January 6, 2008 traffic stop involving Defendant (Tr. at 40-41).

6.    Detective Armstead drove an unmarked minivan and picked up a white female walking on 40 Highway (Tr. at 32-33). In addition to being known for narcotics trafficking, 40 Highway is also known to be frequented by prostitutes (Tr. at 32). SNU commonly used prostitutes to facilitate narcotics purchases (Tr. at 34). Detective Armstead did not have a prior relationship with the white female (Tr. at 34).

7.    When the female entered the minivan, Detective Armstead asked, "Have you seen Dre?" (Tr. at 33). "Dre" is a common moniker used in narcotics transactions; Detective Armstead was not identifying Defendant or referring to any specific individual (Tr. at 34, 45).

8.    The female responded in the negative and asked, "What are you trying to do?" (Tr. at 34). Detective Armstead stated he was looking for forty, referring to $40 worth of crack cocaine (Tr. at 35). The female directed Detective Armstead to the Welcome Inn Motel (Tr. at 35).

9.    Detective Armstead and the female traveled to the Welcome Inn Motel (Tr. at 35). There, the female exited the minivan, entered Room 106, and returned with a black female who tried to sell Detective Armstead crack cocaine for $40 (Tr. at 35). Detective Armstead refused, stating it looked like it was only worth $20 (Tr. at 35, 36). The black female went back inside the motel room; Detective Armstead and the white female left the motel (Tr. at 35, 36).

10.    The white female then asked Detective Armstead to use his cell phone to place a call (Tr. at 35, 36). The female called Defendant and Defendant instructed them to go to the gas station near Blue Ridge and 40 Highway across from Wendy's (Tr. at 36). Once at the gas station, the

female called Defendant to let him know they had arrived (Tr. at 37). Defendant directed them to the BP gas station at 3027 VanBrunt (Tr. at 37).

11.    When Detective Armstead and the white female arrived at 3027 VanBrunt, the female called Defendant (Tr. at 37). She passed the phone to Detective Armstead and Defendant instructed Detective Armstead to meet him at 27th and Quincy (Tr. at 37-38). Defendant then changed his mind and met Detective Armstead at the BP gas station at 3027 VanBrunt (Tr. at 38).

12.    Detective Armstead gave the white female $40 and she approached and entered the black Jeep Wrangler in which Defendant was a passenger (Tr. at 38-39). Detective Armstead observed the white female and Defendant make an exchange (Tr. at 39). The female returned to the minivan and gave Detective Armstead the crack cocaine she purchased (Tr. at 39). Detective Armstead and the female left the area (Tr. at 39).

13.    Detectives surveilling the operation followed the Jeep away from the gas station (Tr. at 39). The detectives merged with the tactical team and performed a car check (Tr. at 40). Stacie Emmerich was the driver of the Jeep; Defendant was the front passenger and Tracie Emmerich and Michelle Carlisle were rear passengers (Tr. at 40).

14.    All four occupants of the Jeep were arrested (Tr. at 40, 60).

15.    Detective Campo interviewed Stacie Emmerich, Tracie Emmerich and Michelle Carlisle on January 16, 2008 (Tr. at 40, 42, 49, 50, 57; Gvt. Exh. 1; Gvt. Exh. 4; Gvt. Exh. 5). They were not asked about the January 6, 2008 traffic stop during their respective interviews (Tr. at 41, 49, 50, 53-54, 56-57; Gvt. Exh. 1; Gvt. Exh. 4; Gvt. Exh. 5).

16.    During Detective Campo's January 16, 2008 interview of Stacie Emmerich, Stacie admitted to knowing that a large amount of crack cocaine was in the vehicle she was driving on

January 15, 2008 (Gvt. Exh. 1).  She stated that when officers approached the car she tried to hide a crack pipe; the pipe was still hot as she had just tried to light the residue (Gvt. Exh. 1).  Stacie stated an individual named Rob (a/k/a Reggie) had left the crack cocaine in the vehicle (Gvt. Exh. 1).  Stacie further stated that prior to being stopped by the police, she stopped the car and Defendant started to talk to a white female (Gvt. Exh. 1).  The white female handed Stacie $40, Stacie gave the $40 to Defendant, then the white female went around to the passenger side of the vehicle to talk to Defendant (Gvt. Exh. 1).  Stacie stated she never observed Defendant selling crack cocaine, only females giving him money (Gvt. Exh. 1).

17.  During Detective Campo's January 16, 2008 interview of Tracie Emmerich, Tracie denied being in possession of crack cocaine (Gvt. Exh. 4).  She stated that on January 15, 2008, she was with her sister Stacie Emmerich and Defendant (Gvt. Exh. 4).  They were driving to a gas station so Defendant could sell some crack cocaine to someone (Gvt. Exh. 4).  Tracie stated that just before they arrived at the gas station, Defendant met with his supplier and bought 1 ½ ounces of crack cocaine (Gvt. Exh. 4).  They were all arrested at the gas station for possession (Gvt. Exh. 4).  Tracie stated that all of the crack cocaine in the car belonged to Defendant (Gvt. Exh. 4).  Tracie further stated that Defendant met with his supplier twice on the day of their arrest and twice the day before (Gvt. Exh. 4).  Tracie told Detective Campo her sister Stacie was helping Defendant sell crack cocaine as much as she could (Gvt. Exh. 4).  Tracie additionally stated Defendant's cousin Robert (a/k/a Reggie) also sold crack with Defendant (Gvt. Exh. 4).  She stated their main supplier was a black male known as "Triple D" (Gvt. Exh. 4).

18.  During Detective Campo's January 16, 2008 interview of Michelle Carlisle, Michelle denied being in possession of crack cocaine (Gvt. Exh. 5).  She stated she had known Defendant for

two to three months (Gvt. Exh. 5).   She had become acquainted with Defendant through her work as a prostitute; many of Michelle's clients and fellow prostitutes liked to smoke crack cocaine (Gvt. Exh. 5).  Michelle called Defendant on a daily basis and he delivered whatever they needed (Gvt. Exh. 5).  She further stated Defendant liked to stay at the Travelers Inn and at the Welcome Inn on 40 Highway; individuals who worked at the hotels knew what Defendant was doing but Defendant paid them not to call the police (Gvt. Exh. 5).

With regard to January 15, 2008, Michelle stated Defendant picked her up between 7:30 p.m. and 7:45 p.m. and they started selling crack cocaine (Gvt. Exh. 5).  Michelle saw Defendant make approximately ten deals to different individuals (Gvt. Exh. 5).  Defendant also met with his main supplier, Triple D, because he was short on supply (Gvt. Exh. 5).  After meeting with Triple D, they drove to a gas station where Defendant was supposed to make a sale (Gvt. Exh. 5).  As soon as they arrived, though, the police pulled up and arrested them for possession (Gvt. Exh. 5).

19.     Following the January 15, 2008 buy, Detective Decker ran the individuals' names and discovered the possession report from the January 6, 2008 traffic stop (Tr. at 43).  Detective Decker spoke to the detective in DEU handling the case and took possession of the case involving the January 6, 2008 traffic stop (Tr. at 43).

20.     The white female who facilitated the buy for Detective Armstead on January 15, 2008 was not identified (Tr. at 46).  She was never interviewed to determine what she knew about the transaction (Tr. at 47).

21.     SNU conducted another undercover operation on January 28, 2008 (Tr. at 41).  This operation was initiated by Detective Armstead calling the number stored on his cell phone that the white female dialed on January 15, 2008 (Tr. at 41, 48).  As a result of the call, Defendant and Stacie

Emmerich appeared and Stacie engaged in a hand-to-hand crack cocaine transaction with Detective Armstead (Tr. at 41-42, 48).

22.     Using the same phone number, Detective Armstead also set up a transaction on January 29, 2008 (Tr. at 42). Defendant and Stacie Emmerich again appeared with the drugs and were arrested (Tr. at 42, 60).

23.     Detective Campo interviewed Stacie Emmerich on January 30, 2008 (Tr. at 42; Gvt. Exh. 2). This time, he specifically asked about the January 6, 2008 traffic stop (Tr. at 42-43, 49, 54). The purpose of the interview was two-fold: to ask her about the January 6, 2008 traffic stop and the drug buys that had occurred on January 28, 2008 and January 29, 2008 (Tr. at 49-50, 54, 60-61; Gvt. Exh. 2).

24.     During the January 30, 2008 interview, Stacie Emmerich told Detective Campo that a friend in the car she was driving got a phone call to meet a male on Independence Avenue (Gvt. Exh. 2). When they got there, Stacie got out of the car and gave a male a baggie of crack cocaine, was given money by the male, returned to the car and then left (Gvt. Exh. 2). Stacie refused to state who originally gave her the crack cocaine to sell and to whom she gave the money when she returned to the car (Gvt. Exh. 2). When Stacie was questioned about Defendant, she stated Defendant was her boyfriend and that she was in love with him (Gvt. Exh. 2). When Detective Campo asked Stacie if she received her crack cocaine from Defendant, Stacie responded that Defendant was not the big fish and that others needed to fry before he did (Gvt. Exh. 2). Stacie did state that Defendant only buys ½ ounce of crack cocaine at a time for which he usually pays around $600 (Gvt. Exh. 2).

        Detective Campo then questioned Stacie about her January 6, 2008 arrest (Gvt. Exh. 2). She stated she was not really driving the car but was sitting in the driver's seat when officers

arrived (Gvt. Exh. 2).  When asked if the crack cocaine in the vehicle belonged to her or Defendant, Stacie responded that it belonged to DeCarlos Walker (Gvt. Exh. 2).  Stacie told Detective Campo that DeCarlos had gotten a call earlier that day from a male who came over from Kansas to sell powder cocaine (Gvt. Exh. 2).  DeCarlos was driving the car and they went to 63rd and Prospect and parked (Gvt. Exh. 2).  When the male from Kansas arrived, DeCarlos got out of the car and did the deal (Gvt. Exh. 2).  DeCarlos bought 4 ounces of powder cocaine and drove everyone back to his house at 41st and Highland where he cooked the powder in his microwave and put the crack in a baggie (Gvt. Exh. 2).  DeCarlos told everyone they needed to leave (Gvt. Exh. 2).  They then got into the car and drove around for awhile, ultimately stopping on Blue Ridge where police showed up and arrested them (Gvt. Exh. 2).

25.    Detective Decker issued a pickup order for Michelle Carlisle based on the drugs that had been recovered during the January 6, 2008 traffic stop (Tr. at 50-51, 61).  Michelle was already in custody at the Municipal Correctional Institute (Tr. at 57).  On February 6, 2008, Detective Campo went to the Municipal Correctional Institute to interview her (Tr. at 57; Gvt. Exh. 6).  Michelle was questioned about the January 6, 2008 traffic stop (Gvt. Exh. 6).

26.    During the February 6, 2008 interview, Detective Campo asked Michelle about her involvement with the narcotics that were found in the vehicle in which she was traveling on January 6, 2008 (Gvt. Exh. 6).  She stated she had just been picked up by Defendant, DeCarlos Walker and Stacie Emmerich (Gvt. Exh. 6).  Defendant had just cooked crack cocaine at DeCarlos's house and was driving around making deliveries (Gvt. Exh. 6).  When asked about her relationship with Defendant, Michelle stated Defendant was the dope guy -- always holding crack or powder cocaine somewhere on his person or in his car (Gvt. Exh. 6).  She stated Defendant liked to hide crack

underneath his colostomy bag because he knew police would not search him there (Gvt. Exh. 6). Michelle stated she was also with Defendant several days later when Defendant bought $500 worth of powder cocaine from Triple D and cooked it into crack cocaine (Gvt. Exh. 6). When Detective Campo asked Michelle about her relationship with DeCarlos Walker, she stated DeCarlos was just a smoker and Defendant used him to cook crack cocaine at his house and to drive Defendant around (Gvt. Exh. 6). Michelle stated Defendant did not trust DeCarlos because DeCarlos had a bad crack addiction (Gvt. Exh. 6). Lastly, Michelle stated Stacie Emmerich loved Defendant and would never give him up (Gvt. Exh. 6).

27.     On March 17, 2008, Stacie Emmerich made a proffer statement and positively identified Defendant in a photospread (Tr. at 54; Gvt. Exh. 3; Gvt. Exh. 9). At the time, Stacie Emmerich was in custody on other federal charges and knew of the impending charges in this case (Tr. at 54, 62). Stacie Emmerich's March 17, 2008 statement includes information dealing with the January 6, 2008 traffic stop (Tr. at 56; Gvt. Exh. 3). The sole reason for the interview was not the traffic stop, however (Tr. at 60-61).

28.     During the photo identification, Stacie Emmerich identified Defendant and stated he was the individual she helped sell crack cocaine (Gvt. Exh. 9). She further stated she had seen Defendant and DeCarlos Walker take 4 ½ ounces of powder cocaine and cook it into crack cocaine on January 6, 2008 (Gvt. Exh. 6).

29.     Stacie Emmerich gave a second proffer statement on April 10, 2008 (Gvt. Exh. 10).

30.     Stacie Emmerich pled guilty to charges in this case on July 1, 2010 pursuant to a plea agreement (Doc. Nos. 149, 150).

31.     Michelle Carlise was interviewed a second time on July 13, 2008 (Gvt. Exh. 11).

She was not asked about the January 6, 2008 traffic stop during this interview (Gvt. Exh. 11). Instead, she was asked how many times she saw Defendant purchase crack cocaine from Triple D, to which she responded she had observed it twice -- once in November of 2007 and once in December of 2007 (Gvt. Exh. 11). She elaborated that Defendant had purchased 3 ½ ounces in November and 1 ½ ounces in December (Gvt. Exh. 11). Michelle stated she remembered Defendant told her if they got caught it would be a federal case due to the amount (Gvt. Exh. 11). Michelle further stated that Triple D was Defendant's main supplier and that they would meet up to three times a day (Gvt. Exh. 11). Michelle told Detective Horalek Defendant sold three packs a day, there being 3 ½ ounces in one pack (Gvt. Exh. 11). Defendant paid the hotels not to call the police on him (Gvt. Exh. 11).

Detective Horalek asked Michelle to explain what occurred on January 15, 2008 (Gvt. Exh. 11). She responded that Defendant had just purchased the crack cocaine from Triple D (Gvt. Exh. 11). Defendant was meeting someone at the gas station to sell them some crack when police arrived and arrested everyone (Gvt. Exh. 11). Michelle stated Defendant always hid the crack cocaine in his colostomy bag and had gotten away with it several times (Gvt. Exh. 11). Lastly, Michelle stated DeCarlos helped cook the crack cocaine when Defendant got powder (Gvt. Exh. 11). Defendant would go over to DeCarlos's house to cook it and gave DeCarlos some to smoke (Gvt. Exh. 11). Michelle stated she had been there a couple times when Defendant and DeCarlos cooked powder cocaine into crack cocaine but could not remember the dates (Gvt. Exh. 11).

### III.  LEGAL ANALYSIS

"Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation

of police illegality." Hamilton v. Nix, 809 F.2d 463, 465 (8th Cir. 1987)(citing Wong Sun v. United States, 371 U.S. 471, 484-88 (1963)). Three distinct exceptions exist to the exclusionary rule: (1) the independent source doctrine; (2) the attenuation doctrine; and (3) the inevitable discovery doctrine. Id.

"Under the 'independent source' doctrine, the challenged evidence will be admissible if the prosecution can show that it derived from a lawful source independent of the illegal conduct." Hamilton, 809 F.2d at 465. Application of this doctrine focuses on "whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct." Id. at 467. The government must establish that the challenged evidence had an independent source by the preponderance of the evidence. United States v. Lewis, 738 F.2d 916, 920-21 (8th Cir. 1984).

Challenged evidence is admissible under the attenuation doctrine "if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint." Hamilton, 809 F.2d at 465-66. "[T]he costs of permanently disabling a witness from testifying and the degree of free will exercised by the witness in testifying" are relevant to this determination. Id. at 476 (citing United States v. Ceccolini, 435 U.S. 268, 279-80 (1978)). To determine the strength of the link between the illegality and a witness's testimony, the Court considers (1) "the stated willingness of the witness to testify"; (2) "the role played by the illegally seized evidence in gaining the witness's cooperation"; (3) "the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial"; and (4) "the police motivation in engaging in the illegal conduct." Id.; see also United States v. Wipf, 397 F3d 677, 684 (8th Cir. 2005).

Lastly, challenged evidence may be admissible under the inevitable discovery doctrine. In order to avail itself of this doctrine, the government must establish by a preponderance of the evidence "that it inevitably would have been discovered by lawful means without reference to the police misconduct." Hamilton, 809 F.2d at 466; see also United States v. Feldhacker, 849 F.2d 293, 296 (8th Cir. 1988). The test for inevitable discovery involves two elements: (1) whether there is "an ongoing line of investigation that is distinct from the impermissible or unlawful technique"; and (2) "a reasonable probability that the permissible line of investigation would have led to the independent discovery of the evidence." United States v. Villalba-Alvarado, 345 F.3d 1007, 1019 (8th Cir. 2003). The alternate line of investigation must have been ongoing at the time of the constitutional violation. United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010); United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008); United States v. James, 353 F.3d 606, 617 (8th Cir. 2003); United States v. Hammons, 152 F.3d 1025, 1029 (8th Cir. 1998); United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997).

### A.      January 16, 2008 Statements - Stacie Emmerich, Tracie Emmerich & Michelle Carlisle

The testimony of Stacie Emmerich, Tracie Emmerich and Michelle Carlisle regarding the information contained in their respective January 16, 2008 statements should be admissible at trial under the independent source doctrine. The Kansas City, Missouri Police Department's street narcotic's unit ("SNU") investigates and deals with low-level street dealers. On January 15, 2008, SNU conducted an undercover operation in an area known for narcotics trafficking. At that time, they were unaware of the January 6, 2008, traffic stop involving Defendant, DeCarlos Walker, Stacie Emmerich and Michelle Carlisle. As part of the January 15, 2008 operation, Detective Armstead used a prostitute to purchase crack cocaine from Defendant who was a passenger in a black Jeep

Wrangler. Following the purchase, detectives who had surveilled the purchase combined forces with the tactical team to perform a car check on the Jeep. Stacie Emmerich (driver), Tracie Emmerich (rear passenger) and Michelle Carlisle (rear passenger) were arrested. Detective Campo interviewed them separately on January 16, 2008. He did not ask any of them about the January 6, 2008 traffic stop; in fact, he did not learn of the January 6, 2008 stop until after the interviews were conducted. As a result, the information gained through the January 16, 2008 interview was obtained from a lawful source.

**B.** **January 30, 2008 Statement - Stacie Emmerich**

The information contained in Stacie Emmerich's January 30, 2008 can be grouped into three general categories: (1) information dealing with the January 6, 2008 traffic stop; (2) information pertaining to activities that had taken place on January 6, 2008 prior to the traffic stop; and (3) information dealing with the January 28-29, 2008 transactions. The government does not intend to elicit testimony at trial concerning the January 6, 2008 traffic stop. Therefore, only the second and third categories will be discussed.

<u>**Activities Prior to Traffic Stop**</u>

The information pertaining to activities that had taken place on January 6, 2008 prior to the traffic stop should not be admissible under either the independent source or inevitable discovery exception. The independent source exception does not permit admission of testimony on this topic as it was neither obtained from lawful sources nor independent of police misconduct. The police only learned about the activities that took place on January 6, 2008 when Detective Decker discovered the report from the constitutionally impermissible January 6, 2008 traffic stop. With regard to the inevitable discovery exception, the government did not establish by a preponderance

of the evidence that there was an ongoing investigation at the time of the constitutional violation. Although dragnet reports were generated by two anonymous tips on October 15, 2007, Detective Decker testified he did not recall when they received the reports. There is no evidence about any investigation prompted by the October 15, 2007 dragnet reports, only general testimony about the way in which an investigation proceeds after a dragnet report is received (Tr. at 31-32). Notably, the undercover operation conducted on January 15, 2008 was not a result of the dragnet reports.

The information pertaining to activities that had taken place on January 6, 2008 prior to the traffic stop should be admissible, however, under the attenuation exception. At the outset, I again note that the government does not intend to ask Stacie Emmerich about the January 6, 2008 traffic stop; it only seeks to elicit trial testimony from her regarding actions that took place on January 6, 2008 prior to the stop. This information is not directly related to the unconstitutional stop and is relevant to the overall conspiratorial actions. The evidence before me demonstrates that Stacie is willing to testify. She decided to cooperate with the police following her legal arrests on January 15, 2008 and January 29, 2008; therefore, her willingness to testify is not directly linked to police misconduct. Specifically, the unconstitutional stop occurred on January 6, 2008. She gave this statement to Detective Campo twenty-four days later. More than two years and eight months will have passed before she is called to testify at trial. Lastly, the record from the June 30, 2009 suppression hearing does not demonstrate that the officers who conducted the January 6, 2008 traffic stop did so based on an improper motive. To the contrary, Officer Mills testified that the stop was based, inter alia, on observations when they saw the vehicle at the Welcome Inn and the area's reputation for crime (Doc. No. 85 at Fact No. 17). The Court should, therefore, find there has been sufficient attenuation to allow Stacie Emmerich to testify at trial about the conspiratorial activities

preceding the January 6, 2008 traffic stop.

**January 28-29, 2008 Transactions**

The testimony concerning the narcotics transactions that took place on January 28-29, 2008 should be admissible at trial under the independent source doctrine. As more fully discussed above, SNU conducted the undercover operation on January 15, 2008 without knowledge of Defendant or the January 6, 2008 traffic stop. During the January 15, 2008 operation, the prostitute used Detective Armstead's cell phone to call Defendant and arrange a transaction. Detective Armstead conducted subsequent undercover operations on January 28th and 29th by utilizing the telephone number stored in his cell phone that the prostitute had dialed. As a result of the calls, Stacie Emmerich engaged in narcotics transactions with Detective Armstead on both dates. Stacie Emmerich was arrested on January 29, 2008 and interviewed by Detective Campo the next day. Information gained about these transactions was thus obtained from a lawful source.

**C.**     **February 6, 2008 Statement - Michelle Carlisle**

The information obtained from Michelle Carlisle during her February 6, 2008 interview should not be admissible under either the independent source or inevitable discovery exceptions. The independent source exception does not permit admission of testimony on this topic as it was neither obtained from lawful sources nor independent of police misconduct. The police only learned about the activities that took place on January 6, 2008 when Detective Decker discovered the report from the constitutionally impermissible January 6, 2008 traffic stop. Based on this information, Detective Decker issued a pickup order for Michelle so that she could be interviewed. With regard to the inevitable discovery exception, the government did not establish by a preponderance of the evidence at the suppression hearing that there was an ongoing investigation at the time of the

18

constitutional violation. Although dragnet reports were generated by two anonymous tips on October 15, 2007, Detective Decker testified he did not recall when they received the reports. There is no evidence about any investigation prompted by the October 15, 2007 dragnet reports, only general testimony about the way in which an investigation proceeds after a dragnet report is received (Tr. at 31-32). Notably, the undercover operation conducted on January 15, 2008 was not a result of the dragnet reports.

The information pertaining to activities that had taken place on January 6, 2008 prior to the traffic stop should be admissible, however, under the attenuation exception. At the outset, I again note that the government does not intend to ask Michelle Carlisle about the January 6, 2008 traffic stop; it only seeks to elicit trial testimony from her regarding actions that took place on January 6, 2008 prior to the stop, action that took place several days after the January 6, 2008 traffic stop, and about relationships with and amongst the some of the alleged co-conspirators. This information is not directly related to the unconstitutional stop and is relevant to the overall conspiracy. The evidence before me demonstrates that Michelle is willing to testify. She decided to cooperate with the police following her subsequent legal arrest on January 15, 2008. Specifically, the unconstitutional stop occurred on January 6, 2008. She gave this statement to Detective Campo one month later. More than two years and seven months will have passed before she is called to testify at trial. Lastly, the record from the June 30, 2009 suppression hearing does not demonstrate that the officers who conducted the January 6, 2008 traffic stop did so based on an improper motive. To the contrary, Officer Mills testified that the stop was based, inter alia, on observations when they saw the vehicle at the Welcome Inn and the area's reputation for crime (Doc. No. 85 at Fact No. 17). The Court should, therefore, find there has been sufficient attenuation to allow Michelle Carlisle to testify

at trial about the these topics.

**D.     March 17, 2008 Statement - Stacie Emmerich**

During the March 17, 2008 photo identification, Stacie identified Defendant as the individual with whom she sold crack cocaine and stated she had seen Defendant and DeCarlos Walker cook powder cocaine into crack cocaine on January 6, 2008. As more fully set forth above, <u>supra</u> III(B), this information should not be found admissible under the independent source or inevitable source exceptions. Based on the same reasoning it should, however, be admissible under the attenuation exception. <u>See</u> Section III(B), <u>supra</u>.

Analysis of the information contained in Stacie Emmerich's March 17, 2008 proffer will be contained in a separate, sealed addendum to this Report and Recommendation.

**E.     April 10, 2008 Statement - Stacie Emmerich**

As stated above, analysis of the information contained in Stacie Emmerich's April 10, 2008 proffer will be contained in a separate, sealed addendum to this Report and Recommendation.

**F.     July 13, 2008 Statement - Michelle Carlisle**

Michelle Carlisle's testimony regarding the information contained in her July 13, 2008 statement should be admissible at trial under the independent source doctrine. As more fully set forth above, <u>supra</u> III(A), the information was obtained from a lawful source (i.e., pursuant to Michelle's January 15, 2008 lawful arrest). When Detective Horalek interviewed Michelle on July 13, 2008, he did not ask her about the January 6, 2008 traffic stop but merely questioned her in more detail about the topics covered in her January 16, 2008 interview.

### *IV. CONCLUSION*

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order granting in part and denying in part Defendant's Motion to Suppress. The Court should not admit any testimony about the January 6, 2008 traffic stop itself. However, testimony should be admitted related to: the conspiratorial activities both preceding and subsequent to the January 6, 2008 traffic stop; relationships with and amongst the alleged co-conspirators; the January 15, 2008 undercover operation; and the undercover operation that occurred on January 28-29, 2008.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 10, 2010